Filed 4/2/24  Stanton v. Marques CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| RYAN STANTON,<br><br>     Plaintiff and Appellant,<br><br>     v.<br><br>FRANCES FONTANE MARQUES et al.,<br><br>     Defendants and Appellants. | B305149<br><br>(Los Angeles County<br>Super. Ct. No. BC572198) |

        APPEAL from a judgment of the Superior Court of Los Angeles County, Randolph M. Hammock, Judge.  Reversed with directions.

        Law Offices of Alain V. Bonavida and Alain V. Bonavida for Plaintiff and Appellant.

        Klapach & Klapach and Joseph S. Klapach for Defendants and Appellants.

———————————————

# INTRODUCTION

Ryan Stanton, a plastic surgeon, sued his business partner and former romantic partner, Frances Fontane Marques, and her daughter, Pablynie Jamison, for misappropriating money through improper distributions from the company managing Stanton's medical practice. The matter proceeded to a nine-day jury trial on Stanton's causes of action for fraud, conversion, breach of the operating agreement, breach of fiduciary duty, constructive fraud, negligent misrepresentation, negligence, obtaining property by false pretenses and larceny under Penal Code section 496, and fraudulent conveyance.

After Stanton presented his case-in-chief, the trial court granted Marques's and Jamison's motions for nonsuit on the causes of action for fraud, Penal Code section 496, breach of fiduciary duty as to Jamison, constructive fraud, negligent misrepresentation, and negligence. The jury ultimately entered a special verdict in Stanton's favor against Marques on the remaining causes of action for conversion, breach of contract, breach of fiduciary duty, and fraudulent transfer, and against Jamison for conversion. It awarded Stanton compensatory damages of $1,652,128 against Marques and $50,000 against Jamison, and punitive damages of $1,000,000 against Marques and $40,000 against Jamison.

Stanton appeals the trial court's grant of nonsuit on his Penal Code section 496 cause of action, and purports to appeal the trial court's postjudgment order denying his Code of Civil

2

Procedure section 2033.420 motion for costs and attorney fees relating to a request for admission.[1]

Marques and Jamison cross-appeal the judgment against Jamison for conversion and the compensatory and punitive damages awards against both of them. They also contend the trial court committed prejudicial evidentiary error by allowing Stanton's counsel to question Jamison about her alleged past work as an escort.

We reverse and remand with directions. First, we reverse the order of nonsuit on Stanton's Penal Code section 496 cause of action. While this appeal was pending, the California Supreme Court decided *Siry Investment, L.P. v. Farkhondehpour* (2022) 13 Cal.5th 333, 361 (*Siry*), which holds that a plaintiff may recover damages under Penal Code section 496, "when property has been obtained in any manner constituting theft." On remand, the trial court shall require Stanton to elect his remedies to the extent he prevails on the Penal Code section 496 cause of action at trial. Next, we conclude we lack jurisdiction to review the trial court's postjudgment order denying Stanton's section 2033.420 motion because he did not appeal from that order. Third, we reverse the judgment and damages award against Marques and Jamison, and remand for a new trial on liability and damages due to inconsistencies in the jury's verdict as to Marques, and prejudicial evidentiary error and insufficient evidence supporting conversion and damages awarded as to Jamison.

---

[1] Undesignated statutory references are to the Code of Civil Procedure.

3

## FACTUAL AND PROCEDURAL BACKGROUND

A.    *The Parties' Relationship, Business, and Lawsuit*

Stanton and Marques began a romantic relationship and moved in together in 2002, as Stanton was launching his plastic surgery practice in Beverly Hills.  In 2005 Stanton and Marques formed a limited liability company called Modern Medical Management LLC ("MMM") to manage Stanton's medical practice, with Stanton and Marques each holding a 50 percent membership interest.  Under the MMM operating agreement, Marques was entitled to 50 percent of net profits and received a $4,500 per month salary.  She testified, however, that she took few salary distributions between 2003 and 2006.  Stanton and Marques ended their romantic relationship and cohabitation in 2009, but remained close friends and business partners, with Stanton "completely trust[ing]" Marques and her management of the business.

Marques served as the managing member of MMM from 2005 through 2014, handling business operations, bookkeeping, banking, and other administrative and financial management tasks for the medical practice while Stanton focused on patient care.  Marques was not an owner of Stanton's medical practice, which was separately incorporated as Modern Institute of Plastic Surgery and Anti-Aging, Inc. ("MIPSA"), but had signatory authority on MIPSA's accounts and the ability to move funds out of MIPSA into MMM.  In 2011 Marques and Stanton hired Marques's daughter Jamison to work for MMM as a bookkeeper and office manager.  Stanton terminated Jamison in August 2014 due to her job performance and after hearing from staff that she claimed to own the business.

4

In August 2014, Stanton transferred his 50 percent interest in MMM to Marques.

After terminating Jamison, Stanton became suspicious when his practice suddenly became more profitable. He discovered irregularities in MMM's books, including a spreadsheet showing different member distributions from MMM. He confronted Marques about the discrepancies and locked her out of his medical practice in October 2014. On November 8, 2014 bookkeeper Michele Askori discovered the Quickbooks data for Stanton's practice had been deleted from the office computer Jamison was using before she was fired.

In 2015 Stanton filed the underlying action against Marques, Jamison, MMM, and Marques Management LLC (an entity solely owned by Marques), alleging Marques and Jamison misappropriated millions of dollars from Stanton's medical practice. Stanton's operative second amended complaint stated causes of action for fraud, conversion, breach of MMM's operating agreement, breach of fiduciary duty, constructive fraud, negligent misrepresentation, negligence, obtaining property by false pretense and larceny under Penal Code section 496, and fraudulent conveyance. Stanton sought compensatory damages, punitive damages, and rescission of contract.

In December 2019 and January 2020 the trial court conducted a nine-day jury trial. Marques's defense theory was that Marques was entitled to "pay herself" after investing her own money and sweat equity without compensation in the early years of the business. According to Marques and Jamison, Stanton knew Marques was paying personal expenses from company funds, and he also used MMM funds for his personal expenses. They also maintained the amounts paid to Jamison

5

were solely salary related.  Finally, according to Marques and Jamison, Stanton sued them because he wanted to "get back" at Marques and regretted going into business with her.

B.     *The Evidence at Trial*

At trial, the jury heard testimony in Stanton's case-in-chief from forensic accounting and damages expert Leonard Lyons, Stanton's current bookkeeper Michele Askori, and Stanton. Stanton called Marques and Jamison as hostile witnesses. Stanton also introduced into evidence voluminous financial exhibits, including bank records, detailed accounting records, and forensic analysis.

Lyons testified Marques received $2,442,628 in total payments from MMM, while Stanton received $372,699.  Lyons offered two alternative damages calculations at trial.  The first calculated Stanton's damages as $1,034,965, and assumed the operating agreement was valid, entitling Marques and Stanton to a 50 percent interest in net profits.  The second calculated Stanton's damages as either $1,952,128 or $2,442,628 (depending on whether Marques was entitled to a salary); for this calculation, Lyons assumed the operating agreement was not valid and that Marques had "no right to any of the profits."

Lyons also testified that what appeared to be Marques's personal expenses and personal travel were on MMM's books, including a $60,000 watch that was recorded as a medical supplies expense.  He further testified Marques withdrew $112,024.24 from Stanton's surgical practice (MIPSA) even though she was not an owner of that entity and that she used $564,396.74 obtained from MMM to purchase a home in Santa Monica, which she transferred into a trust on the eve of litigation.

6

Marques and Jamison testified on their own behalf and called Stanton as a witness. They did not present any expert on damages. Marques testified she contributed $300,000 of her own funds to remodel the surgical center shortly after starting to work with Stanton. Jamison was paid a salary of $4,000 per month as an independent contractor, which was later raised to $4,500 per month, plus health insurance benefits, a cell phone, and car payments. Marques testified she authorized the payment of Jamison's health insurance, cell phone, and car payments. Jamison testified that Lyons had mistakenly identified a number of business expenses as personal expenses in his analysis, such as $1,000 charges for cleaning and $86 for pest control.

C.      *The Motions for Nonsuit by Marques and Jamison*

At the close of Stanton's case-in-chief, the trial court granted the oral nonsuit motion of Marques and Jamison as to Stanton's causes of action for fraud, Penal Code section 496, breach of fiduciary duty as to Jamison, constructive fraud, negligent misrepresentation, and negligence.[2] The remaining claims for the jury were breach of contract, conversion, breach of fiduciary duty, and fraudulent transfer against Marques, and conversion only against Jamison.

As to Stanton's Penal Code section 496 cause of action, the trial court stated: "I looked at the statute very carefully. This [statute] is [for] one who receives stolen property. Receives or hides it, okay? . . . That section covers people that are like the fence, . . . and that's why you get the treble damages . . . . I don't think I can properly allow it because I don't think the evidence

_____

[2]      Stanton only appeals from the nonsuit as to the Penal Code section 496 cause of action.

7

fits that theory. . . . Their evidence is overwhelming that a theft on a conversion took place."

D. *Jury Finds for Stanton and Awards him Damages and Punitive Damages*

On January 3, 2020 the jury entered a special verdict in Stanton's favor on the conversion, breach of contract, breach of fiduciary duty, and fraudulent transfer causes of action.

The jury awarded Stanton $1,652,128 in noncumulative compensatory damages on each cause of action against Marques for conversion, breach of MMM's operating agreement, and breach of fiduciary duty.[3] The jury also found Marques fraudulently transferred her real property to her family trust and LLC. The jury awarded Stanton $50,000 in compensatory damages against Jamison for conversion.

The jury also found by clear and convincing evidence that Marques acted with malice, fraud or oppression with respect to the conversion and breach of fiduciary duty claims, and that Jamison acted with malice, fraud or oppression with respect to the conversion claim.

On January 6 the court conducted a jury trial on punitive damages and the jury awarded Stanton $1,000,000 in punitive damages against Marques and $40,000 in punitive damages against Jamison. The evidence of net worth presented to the jury included that Marques owned two unencumbered real properties

---

[3] The jury was instructed under CACI No. 3943 (Damages on Multiple Legal Theories) that "each item of [compensatory] damages may be awarded only once, regardless of the number of legal theories alleged" or under which the defendants are ultimately found liable.

8

with fair market value of $3,650,000 and $1,800,000 at the time of trial, and Marques's testimony that she had other assets worth at most $178,000 and current liabilities of $97,500. The parties stipulated Jamison had a net worth of $500,000.

On January 7 the court held a hearing on equitable issues at which it denied Stanton's equitable claim of rescission, denied Stanton's oral motion to amend the complaint to allege constructive trust, and voided the transfers of Marques's real property to other entities.

E.    *Judgment and Post-trial Motions*

On January 15 the trial court entered judgment in favor of Stanton and against Marques and Jamison, and awarded the damages amounts found by the jury. Specifically, the court awarded $1,652,128 in compensatory damages against Marques for conversion, breach of MMM's operating agreement, and breach of fiduciary duty; $50,000 in compensatory damages against Jamison for conversion; $1,000,000 in punitive damages against Marques, and $40,000 in punitive damages against Jamison.

Marques and Jamison filed a motion for a new trial and a motion to set aside and vacate the judgment. Among other things, they argued the jury's special verdict was inconsistent as to the damages awarded against Marques, and that the compensatory and punitive damages awards were excessive and unsupported by the evidence. On March 10, 2020 the trial court denied these motions.

9

F.     *The Parties' Notices of Appeal*

On March 20 Stanton filed a notice of appeal from the January 15 judgment and the January 2 order granting nonsuit. The notice further stated Stanton appealed from "All Orders/Rulings that are separately appealable which will be detailed within Plaintiff's Appellant's Opening Brief."  On April 6, 2020 Marques and Jamison filed a notice of appeal from the January 15 judgment, the January 2 order denying Jamison's motion for nonsuit as to conversion, and from "All Orders/Rulings that are separately appealable which will be detailed within Defendants'/Cross-Appellants' Opening Brief."

G.     *Stanton's Section 2033.420 Motion Was Decided After He Filed His Notice of Appeal*

On March 16 Stanton moved for an award of over $350,000 in attorney fees and costs pursuant to section 2033.420. According to Stanton, he was entitled to recover that amount due to Marques and Jamison's refusal to admit to the following request for admission he propounded during discovery:  "Admit that you stole monies from Plaintiff."

On July 2, after Stanton's notice of appeal was filed, the trial court denied the section 2033.420 motion.  At the hearing, the court stated that it was "one of the most frivolous motions I've ever seen," and that section 2033.420 was "not designed for" broad requests for admission that ask, "'Admit that I'm going to win this case.'"  Instead, the statute applied "when somebody unreasonably denies something that they should not deny."  The

trial court alternatively determined an award of attorney fees and costs was not warranted under the statute.[4]

Stanton did not separately appeal from the trial court's July 2 postjudgment order denying his section 2033.420 motion.

## DISCUSSION

A.    *Stanton's Appeal*

Stanton appeals the trial court's grant of nonsuit on his Penal Code section 496 cause of action and the trial court's order denying his section 2033.420 motion.  We reverse the grant of nonsuit and remand for new trial on the Penal Code section 496 cause of action.  We lack jurisdiction to review the trial court's order denying Stanton's section 2033.420 motion because he did not separately appeal the postjudgment order denying it.[5]

---

[4]    First, the court determined Stanton's request, "'Admit that you stole money from me,'" was of "'no substantial importance'" under section 2033.420, subdivision (b)(2).  Second, it ruled Marques and Jamison "'had reasonable ground to believe that [they] would prevail on the matter'" under section 2033.420, subdivision (b)(3), due to Marques's rights as a partner in MMM and Jamison's employment agreements with MMM.  Third, the court determined Marques and Jamison had "good reasons to deny [Stanton's] completely overbroad and improper request for admission," which appeared to be "just a setup" for Stanton to argue liability was "deemed admitted" and "not really calculated to lead to the discovery of admissible evidence."  (See § 2033.420, subd. (b)(4) [court may deny order for costs of proof if "[t]here was other good reason for the failure to admit"].)

[5]    It is unclear whether Stanton has standing to bring all of his claims because some might belong to MMM and he did not bring a derivative action.  (See *Sirott v. Superior Court* (2022)

---

11

1. *The Trial Court Erred by Granting Nonsuit on Stanton's Penal Code Section 496 Cause of Action*
   a. *Governing law and standard of review*

After the plaintiff's opening statement or case-in-chief, the defendant may move for a judgment of nonsuit. (§ 581c, subd. (a).) "If it appears that the evidence presented, or to be presented, supports the granting of the motion as to some but not all of the issues involved in the action, the court shall grant the motion as to those issues and the action shall proceed as to the issues remaining." (§ 581c, subd. (b).)

"A motion for nonsuit allows a defendant to test the sufficiency of the plaintiff's evidence before presenting his or her case. Because a successful nonsuit motion precludes submission of plaintiff's case to the jury, courts grant motions for nonsuit only under very limited circumstances. [Citation.] A trial court must not grant a motion for nonsuit if the evidence presented by the plaintiff would support a jury verdict in the plaintiff's favor. [Citations.] [¶] 'In determining whether plaintiff's evidence is sufficient, the court may not weigh the evidence or consider the credibility of witnesses. Instead, the evidence most favorable to the plaintiff must be accepted as true and conflicting evidence must be disregarded. The court must give "to the [plaintiff's]

---

78 Cal.App.5th 371, 383; *Holistic Supplements, LLC. v. Stark* (2021) 61 Cal.App.5th 530, 541-543; *Denevi v. LGCC, LLC* (2004) 121 Cal.App.4th 1211, 1221-1222; Corp. Code, § 17709.02.) Further, at oral argument the parties represented that Stanton's interest in MMM was transferred to Marques and that the trial court subsequently found MMM was her alter ego. In light of our reversal, we need not resolve the issue of standing but, on remand, the defendants should have an opportunity to file an appropriate motion to challenge Stanton's standing to bring suit.

12

evidence all the value to which it is legally entitled, . . . indulging every legitimate inference [that] may be drawn from the evidence in plaintiff['s] favor."'" (*Carson v. Facilities Development Co.* (1984) 36 Cal.3d 830, 838-839; accord, *O'Neil v. Crane Co.* (2012) 53 Cal.4th 335, 347; *Lacagnina v. Comprehend Systems, Inc.* (2018) 25 Cal.App.5th 955, 967.)

On appeal from a judgment following a grant of nonsuit, the reviewing court similarly interprets the evidence "in the light most favorable to the plaintiff" and "'most strongly against the defendant," resolving all presumptions, inferences, and doubts in the plaintiff's favor. (*Carson v. Facilities Development Co., supra,* 36 Cal.3d at p. 839.) A grant of nonsuit may only be upheld on appeal when, drawing all reasonable inferences in favor of the nonmoving party, the court determines the moving party was entitled to resolution of the issue, claim or action in his or her favor as a matter of law. (See *ibid.*; *Lombardo v. Huysentruyt* (2001) 91 Cal.App.4th 656, 664.)

### b. *Penal Code section 496 and* Siry Investment, L.P. v. Farkhondehpour

Penal Code section 496, subdivision (a), describes the crime of receiving stolen property and also provides a civil cause of action with treble damages. (*Siry, supra,* 13 Cal.5th at p. 346.) "As amended in 1972 . . . it provides in relevant part: 'Every person who buys or receives any property that has been stolen or that has been obtained in any manner constituting theft or extortion, knowing the property to be so stolen or obtained, or who conceals, sells, withholds, or aids in concealing, selling, or withholding any property from the owner, knowing the property to be so stolen or obtained,' is subject to incarceration." (*Ibid.*)

13

Subdivision (c) provides for civil recovery of treble damages for anyone "who has been injured by a violation of subdivision (a)." "Section 496(c) . . . articulates a right to special civil remedies when a violation of section 496(a) has occurred. Subdivision (c) . . . states that any person who has been injured by a violation of section 496(a) 'may bring an action for three times the amount of actual damages, if any, sustained by the plaintiff, costs of suit, and reasonable attorney's fees.'" (*Siry, supra,* 13 Cal.5th at pp. 346-347, fn. omitted.) "[A] criminal conviction under section 496(a) is not a prerequisite to recovery of treble damages under section 496(c)." (*Bell v. Feibush* (2013) 212 Cal.App.4th 1041, 1043 (*Bell*); accord, *id.* at p. 1046 [holding "violation" unambiguously connotes conduct not conviction; "'the purpose of the statute would be defeated if the statute operated to condition civil liability upon criminal liability'"].)

As the high court recently clarified, Penal Code section 496 is not limited to receiving or trafficking in stolen goods. In *Siry,* which was decided after the trial court proceedings in this case, the California Supreme Court held a trial court may award treble damages and attorney fees under Penal Code section 496, subdivision (c), "in a case involving, not trafficking of stolen goods, but instead, fraudulent diversion of a partnership's cash distributions." (*Siry, supra,* 13 Cal.5th at p. 339; fn. omitted.) The Court concluded that Penal Code section 496, subdivision (c), "is unambiguous" and that when read together with subdivision (a) and Penal Code section 484 (defining theft), "[a] plaintiff may recover treble damages and attorney's fees under section 496(c) when property has been obtained in any manner

constituting theft."[6] (*Siry,* at p. 361.)  The Court reiterated that "the term 'theft' in section 496 includes forms of theft listed 'in the general theft statute (Pen. Code, § 484), i.e., theft committed by means of larceny, embezzlement, or false pretenses.'" and that the "broad phras[ing]" of Penal Code section 496, subdivision (a) expressly targets property 'obtained in any manner constituting theft.'" (*Siry*, at p. 350, fn. 11.)

> c.  Siry *requires reversal of the nonsuit as to Stanton's Penal Code section 496 cause of action and remand for a new trial*

The trial court granted nonsuit on Stanton's Penal Code section 496 cause of action, without the benefit of *Siry*, reasoning that the statute applied only to a defendant "who receives stolen property" like a "fence," and not a defendant accused of stealing property directly.  In supplemental briefing, Marques and Jamison concede *Siry* rejected the trial court's rationale for the nonsuit.  They assert, however, that the grant of nonsuit was still proper because Stanton failed to prove Marques and Jamison

---

[6]  In relevant part, Penal Code section 484, subdivision (a), defines the crime of theft:  "Every person who shall feloniously steal, take, carry, lead, or drive away the personal property of another, or who shall fraudulently appropriate property which has been entrusted to him or her, or who shall knowingly and designedly, by any false or fraudulent representation or pretense, defraud any other person of money, labor or real or personal property, or who causes or procures others to report falsely of his or her wealth or mercantile character and by thus imposing upon any person, obtains credit and thereby fraudulently gets or obtains possession of money, or property or obtains the labor or service of another, is guilty of theft."

obtained any of his property by false pretenses. In their view, Stanton's Penal Code section 496 claim cannot be predicated on theft by false pretenses because the trial court also granted nonsuit on Stanton's fraud and negligent misrepresentation causes of action, neither of which Stanton challenges on appeal. This is a distinction without a difference in light of *Siry*'s broad, unambiguous holding that a plaintiff may recover under Penal Code section 496, subdivision (c), when property has been "obtained in *any* manner constituting theft." (*Siry, supra,* 13 Cal.5th at p. 361.)

Stanton's cause of action for violation of Penal Code section 496 was not solely based on theft by false pretenses. Rather, the cause of action in his complaint was premised on Marques and Jamison "obtaining property by false pretense *and larceny*." (Emphasis added.) The cause of action incorporated all other factual allegations in the complaint, except those limited to fraudulent conveyance, and stated that Marques and Jamison "wrongfully and by fraud, artifice and trickery obtained possession of monies belonging to Stanton," by which acts they "committed a theft as defined by California Penal Code section 484(a)" and "[b]y virtue of receiving these monies . . . violated CA Penal Code § 496(c)."

Further, Stanton's evidence at trial was sufficient to survive a nonsuit for violation of Penal Code section 496 as interpreted by *Siry*. The evidence of Marques's disproportionate payouts from MMM, combined with her unilateral authorization of benefits and car payments for Jamison without Stanton's approval, was more than sufficient to support a jury finding that Marques and Jamison obtained and received money by theft from

16

Stanton's medical practice in violation of Penal Code section 496, subdivision (a).[7]

In sum, the trial court erred in granting nonsuit on Stanton's Penal Code section 496 cause of action. We decline, however, Stanton's request to amend the judgment to include a finding that Marques and Jamison also violated Penal Code section 496. Where the trial court erred in granting a nonsuit, "[t]he remedy requires that we reverse and remand for a new trial on the cause of action for which the trial court granted nonsuit." (*Samantha B. v. Aurora Vista Del Mar, LLC* (2022) 77 Cal.App.5th 85, 108 [rejecting similar request to include a finding of respondeat superior where trial court erroneously granted nonsuit on that basis because defendant was entitled to jury determination].) Accordingly, we reverse and remand for a new trial on Stanton's Penal Code section 496 cause of action.

> d. *Stanton will need to elect his damages if he prevails on his Penal Code section 496 cause of action*

If Stanton prevails on his Penal Code section 496 cause of action on remand, he may be entitled to treble damages, requiring him to elect his damages (subject to any new compensatory and punitive damages awarded after a new trial). Marques and Jamison argue Stanton is precluded entirely from pursuing a claim for treble damages under Penal Code section 496, subdivision (c), because the jury already awarded

---

[7]    Marques and Jamison also contend Stanton cannot establish a Penal Code section 496 claim against Jamison because the conversion claim against Jamison is legally deficient. We address this argument below.

him damages for conversion, breach of fiduciary duty, and breach of contract on a theory of civil theft.  Thus, they contend, any finding on remand that they violated Penal Code section 496 based on the same conduct underlying their liability for the other causes of action would constitute impermissible "dual liability." But Marques and Jamison conflate two distinct issues: (1) whether double or duplicative damages are prohibited in a Penal Code section 496 civil action, and (2) whether obtaining damages on Stanton's other causes of action for the same conduct precludes him from pursuing his Penal Code section 496 claim on remand.

Marques and Jamison base their argument on Penal Code section 496, subdivision (a)'s bar on dual *convictions*:  "A principal in the actual theft of the property may be convicted pursuant to this section.  However, no person may be convicted both pursuant to this section and of the theft of the same property."  "Thus, a person who obtains property by theft may be convicted for theft or for receiving stolen property, but not both." (*Bell, supra,* 212 Cal.App.4th at p. 1049; accord, *People v. Allen* (1999) 21 Cal.4th 846, 857-861.)

As *Bell* noted in a case involving a loan fraudulently obtained for a scam business and never repaid:  "Were that principle [against dual convictions] applied to [defendant's] civil liability under section 496(c), he would not be liable for damages under the breach of contract and fraud causes of action and treble damages under the statute." (*Bell, supra,* 212 Cal.App.4th at p. 1049; see *Siry, supra,* 13 Cal.5th at p. 370 (conc. opn. of Groban, J.) [noting *Bell* "rais[ed] the issue" whether Penal Code section 496, subdivision (a), "which bars dual convictions of the

theft itself and the receipt of stolen property, operates to bar "'double recovery'" in the civil context"].)

We need not determine whether or how Penal Code section 496's bar on dual convictions translates to the civil context, however, given the existing general principles against double or duplicative recovery in a civil action. As the California Supreme Court has explained, "[r]egardless of the nature or number of legal theories advanced by the plaintiff, he is not entitled to more than a single recovery for each distinct item of compensable damage supported by the evidence. [Citation.] Double or duplicative recovery for the same items of damage amounts to overcompensation and is therefore prohibited. [Citation.] [¶] . . . [¶] In contrast, where separate items of compensable damage are shown by distinct and independent evidence, the plaintiff is entitled to recover the entire amount of his damages, whether that amount is expressed by the jury in a single verdict or multiple verdicts referring to different claims or legal theories." (*Tavaglione v. Billings* (1993) 4 Cal.4th 1150, 1158-1159; accord, *Roby v. McKesson Corp.* (2009) 47 Cal.4th 686, 703 [overlapping non-economic damages awards on different causes of action "had the effect of compensating [the plaintiff] multiple times for the same injury."]; *Plotnik v. Meihaus* (2012) 208 Cal.App.4th 1590, 1612; *Zuniga v. Cherry Avenue Auction, Inc.* (2021) 61 Cal.App.5th 980, 997.) Accordingly, the jury here was expressly instructed that "each item of damages may be awarded only once, regardless of the number of legal theories alleged" or under which the defendants are ultimately found liable.

19

Duplicative penalties, punitive damages, or multiple damages awards are also prohibited unless a statute unequivocally authorizes double recovery.  "California courts have held that if a defendant is liable for a statutory penalty or multiple damages under a statute, the award is punitive in nature, and the award penalizes essentially the same conduct as an award of punitive damages.  The plaintiff cannot recover punitive damages in addition to that recovery but must elect its remedy.  [Citations.]  To impose both a statutory penalty or multiple damages award and punitive damages in those circumstances would be duplicative.  [Citations.]  We presume that the Legislature did not intend to allow such a double recovery absent a specific indication to the contrary."  (*Fassberg Construction Co. v. Housing Authority of City of Los Angeles* (2007) 152 Cal.App.4th 720, 759-760 (*Fassberg*); see *Los Angeles Unified School District v. Superior Court* (2023) 14 Cal.5th 758, 778 ["This court and others have frequently characterized treble damages as exemplary or punitive."]; see also *Troensegaard v. Silvercrest Industries, Inc.* (1985) 175 Cal.App.3d 218, 228 [had the Legislature intended a double recovery of punitive and penal damages for the same acts, "it would in some appropriate manner have said so"].)

But the rule against double recovery of damages for the same conduct does not preclude Stanton from pursuing multiple or alternate theories of liability in the same action.  "'"That a given set of facts fortuitously supports liability on two legal theories is not a principled reason to deny a party the right to pursue each theory."'"  (*Bowser v. Ford Motor Co.* (2022) 78 Cal.App.5th 587, 624 (*Bowser*); accord, *County of Santa Clara v. Atlantic Richfield Co.* (2006) 137 Cal.App.4th 292, 310.)  In

other words, while dual *recovery* is prohibited, "dual liability" is not.  It merely requires an election of damages to the extent there is any overlap or duplication of damages once liability on all causes of action is determined.  (*Bowser*, at p. 624 ["[T]he prospect of a double recovery requires the plaintiff to elect only between amounts that are duplicative, not those that are not."].)  In *Bowser,* for example, the plaintiffs in a lemon law case "could properly be required to elect between their Song-Beverly compensatory damages and their fraud compensatory damages," each of which awarded the purchase price of the nonconforming vehicle (less different specified values), "because their damages for fraud overlapped their damages under the Song-Beverly Act."  (*Ibid*.)

"Normally, in a double recovery situation, the plaintiff will choose the larger amount.  In that event, the larger award *embraces* the smaller award."  (*Bowser, supra,* 78 Cal.App.5th at p. 624.)  In *Siry*, for instance, the high court was not presented with a question of duplicative damages because the trial court there required the plaintiff to choose between either treble damages based on Penal Code section 496 or punitive damages based on fraudulent diversion of partnership funds.  After the jury found in his favor on both theories, the plaintiff elected to collect treble damages.  (*Siry, supra,* 13 Cal.5th at p. 342, see *id*. at p. 361.)  Similarly, in *Bell*, the judgment awarded plaintiff "$202,500 in damages on the breach of contract cause of action, the same amount on the fraud cause of action, and treble damages of $607,500 under the section 496(a) cause of action," and directed that "'[n]o double recovery'" was to occur.  (*Bell, supra,* 212 Cal.App.4th at p. 1049.)  The appellate court explained that "[a]s a consequence, the principal amount of

21

damages recoverable under the judgment cannot exceed $607,500—which is [defendant]'s treble damage liability under section 496(c)." (*Ibid.*)

Accordingly, on remand, any damages awarded on the other causes of action after a new trial would not preclude Stanton from pursuing his Penal Code section 496 cause of action for the same conduct. But Stanton is required to elect his remedies as between treble damages, on the one hand, and punitive damages, on the other hand, should he prevail.

2. *We Lack Jurisdiction To Review Stanton's Section 2033.240 Motion*
   a. *Governing law and standard of review*

During pretrial discovery a party may serve a written request that another party "admit the genuineness of specified documents, or the truth of specified matters of fact, opinion relating to fact, or application of law to fact." (§ 2033.010; *Vargas v. Gallizzi* (2023) 96 Cal.App.5th 362, 370 (*Vargas*).) Such requests for admission "'are primarily aimed at setting at rest a triable issue so that it will not have to be tried.'" (*Bloxham v. Saldinger* (2014) 228 Cal.App.4th 729, 752; accord, *Orange County Water Dist. v. The Arnold Engineering Co.* (2018) 31 Cal.App.5th 96, 115 ["'requests for admission serve to narrow discovery, eliminate undisputed issues, and shift the cost of proving certain matters'"].) If a party denies a request for admission that is later proved, section 2033.420, subdivision (a), provides for an award of costs of proof.

22

Our review of a trial court's ruling on a section 2033.420 motion is for abuse of discretion.  (See *Vargas, supra,* 96 Cal.App.5th at pp. 270-271; accord, *Bloxham v. Saldinger, supra,* 228 Cal.App.4th at p. 753.)

    b. *We lack jurisdiction to review the trial court's order denying Stanton's section 2033.420 motion*

Marques and Jamison contend we lack jurisdiction to review the denial of Stanton's section 2033.420 motion because Stanton did not separately appeal the postjudgment order denying his motion.  We agree.

"A postjudgment order which awards or denies costs or attorney's fees is separately appealable, and if no appeal is taken from such an order, the appellate court has no jurisdiction to review it."  (*Silver v. Pacific American Fish Co., Inc.* (2010) 190 Cal.App.4th 688, 693; accord, *Colony Hill v. Ghamaty* (2006) 143 Cal.App.4th 1156, 1171 (*Colony Hill*) ["'An appellate court has no jurisdiction to review an award of attorney fees made after entry of the judgment, unless the order is separately appealed'"]; see § 904.1, subd. (a)(2).)

Although notices of appeal must be liberally construed (Cal. Rules of Court, rule 8.100(a)(2)), we cannot construe Stanton's March 20, 2020 notice of appeal to include the subsequent July 2 postjudgment order denying his section 2033.420 motion. "'"[W]here several judgments and/or orders occurring close in time are separately appealable (e.g., judgment and order awarding attorney fees), each appealable judgment and order must be expressly specified—in either a single notice of appeal or multiple notices of appeal—in order to be reviewable on appeal."'" (*Colony Hill, supra,* 143 Cal.App.4th at p. 1171; accord, *DeZerega v. Meggs* (2000) 83 Cal.App.4th 28.)

23

Here, Stanton's notice of appeal was filed three months before the postjudgment order denying his section 2033.420 motion.  The general statement in Stanton's notice of appeal that he purported to appeal from "All Orders/Rulings that are separately appealable" is insufficiently specific to encompass his then-pending and not-yet-ruled-upon section 2033.420 motion. "'Despite the rule favoring liberal interpretation of notices of appeal, a notice of appeal will not be considered adequate if it completely omits any reference to the judgment [or order] being appealed.'" (*Norman I. Krug Real Estate Investments, Inc. v. Praszker* (1990) 220 Cal.App.3d 35, 47.)

"[A] postjudgment award of attorney fees may be subsumed in a previously filed notice of appeal" (*Bankes v. Lucas* (1992) 9 Cal.App.4th 365, 368-369) in limited circumstances. Specifically, "when a judgment awards costs and fees to a prevailing party and provides for the later determination of the amounts, the notice of appeal subsumes any later order setting the amounts of the award." (*Grant v. List & Lathrop* (1992) 2 Cal.App.4th 993, 998 [court's order setting attorney fee award entered after notice of appeal filed].)  *Grant* emphasized that the entitlement to fees in that case had been expressly determined in the first judgment and was therefore not a purely collateral issue, separately tried.  (*Ibid*.)

Such circumstances are not present here.  The judgment in this case provided that Marques and Jamison were liable to Stanton for attorney's fees and costs "as may be allowed by law, TBD."  But resolution of Stanton's section 2033.420 motion required the trial court to make a separate determination of his entitlement to costs and attorney fees expended towards proving true a specific request for admission that was originally denied.

It was thus a collateral issue, separately tried outside of the judgment. "The entire litigation of that issue occurred after the entry of the judgment from which the appeal was taken. Accordingly the judgment cannot be said to 'subsume' the later fee award. It follows that the exception adopted in *Grant* cannot be held to apply, and jurisdiction over the fee award cannot be found." (*DeZerega v. Meggs, supra,* 83 Cal.App.4th at pp. 43-44 [no jurisdiction to review postjudgment order adjudicating motion for attorney fees under Civil Code section 1717 filed after judgment was entered, where judgment appealed from allowed "costs of suit" but did not award attorney fees].)

B.     *Marques and Jamison's Cross-Appeal*

Marques and Jamison cross-appeal arguing that: the trial court committed prejudicial error by allowing Stanton's counsel to introduce evidence about her alleged past work as an escort; the judgment against Jamison for conversion was unsupported by the evidence; and the compensatory and punitive damages awards against both defendants were excessive and unsupported by the evidence. We agree and reverse for a new trial on liability and damages.

1. *The Trial Court Erred by Allowing Extended and Unduly Prejudicial Questions About Jamison's Alleged Past Work as an Escort*
   a.     *Governing law and standard of review*

Under Evidence Code section 785, "[t]he credibility of a witness may be attacked or supported by any party," and under section 1101, subdivision (c), character evidence is admissible when "offered to support or attack the credibility of a witness." Section 1101, subdivision (b), permits "the admission of evidence

25

that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, . . .) other than his or her disposition to commit such an act." However, evidence of a person's character, including "evidence of specific instances of his or her conduct," "is inadmissible when offered to prove his or her conduct on a specified occasion" (*id.*, subd. (a)) and courts must also "protect the witness from undue harassment or embarrassment" (*id.,* subd. (a)).

Under Evidence Code section 352, "[t]he court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will . . . (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." We review for abuse of discretion. (*People v. Barnett* (1998) 17 Cal.4th 1044, 1118 ["When a trial court overrules a defendant's objections that evidence is . . . unduly prejudicial . . . , we review the rulings for abuse of discretion."]; see *Zuniga v. Alexandria Care Center, LLC* (2021) 67 Cal.App.5th 871, 883-884.)

A judgment may be reversed for the erroneous admission of evidence only if the error "resulted in a miscarriage of justice." (Evid. Code, § 353, subd. (b).) "Claims of evidentiary error under California law are reviewed for prejudice applying the 'miscarriage of justice' or 'reasonably probable' harmless error standard of *People v. Watson* (1956) 46 Cal.2d 818, 836, that is embodied in article VI, section 13 of the California Constitution. Under the *Watson* harmless error standard, it is the burden of appellants to show that it is reasonably probable that they would have received a more favorable result at trial had the error not

26

occurred." (*Christ v. Schwartz* (2016) 2 Cal.App.5th 440, 447; see *Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 800 [error justifies reversal in a civil action only if it is reasonably probable a different result would have been reached absent the error].)

> b. *The trial court should not have admitted evidence of Jamison's alleged escort work, and the error was not harmless*

Marques and Jamison contend the trial court committed reversible error by permitting Stanton's counsel to question Jamison at length and by admitting text messages about her alleged past work as a prostitute or escort in Las Vegas, over defense counsel's objection. They argue this line of questioning had no probative value and no purpose other than as improper character evidence offered to harass and embarrass them.

Stanton contends the inquiry into Jamison's alleged escort work was relevant to impeach Jamison's credibility under Evidence Code sections 785 and 1101, subdivision (c), and to establish motive under Evidence Code section 1101, subdivision (b). Stanton argues the prejudicial impact of this questioning was substantially outweighed by its probative value as to Jamison's credibility and motive.

Questions from Stanton's counsel to Jamison during Stanton's case-in-chief spanned 13 pages of the reporter's transcript and included the following exchange:

[Counsel]      The reason why your mother, Ms. Marques, wanted you to leave Vegas and come to Los Angeles and work for Dr. Stanton is because she

|  |  |
|---|---|
|  | wanted you to stop engaging as an escort in Vegas, correct? |
| [Jamison] | No, that is not – |
| [Counsel] | And in fact, you were on websites in Vegas as an escort for, quote-unquote, high rollers in Vegas, correct? |
| [Jamison] | No, that's a complete lie. |
|  | . . . |
| [Counsel] | In fact, Ms. Jamison, you got into fights with your mother about the very same issue. . . . Is that correct? |
| [Jamison] | I don't believe so. . . . I never engaged in prostitution. |
| [Counsel] | Let's look at the screen. . . . Did you ever sign up or be part of a website called Seeking Arrangements? |
| [Jamison] | I don't remember. |
| [Counsel] | I'll try to refresh your recollection.  Seeking Arrangements is a website where, quite explicitly, it advertises to usually older men looking for younger women.  The men refer to themselves as sugar daddies.  The women, normally like yourself at the time, refer to themselves as sugar babies.  Does that refresh your recollection? |
| [Jamison] | I've heard of sites like that.  I'm not sure if I've heard of this specific one. |
| [Counsel] | Were you ever a member of a site like that? |
| [Jamison] | No. |
|  | . . . |

[Counsel]        [T]his is a two-page document that are text messages between yourself and your mother. . . . Read the next paragraph, please. . . .

[Jamison]      "You should go back to your prostitution job position in Vegas and try to make something out of your sorry self. . . ."

Stanton's counsel also questioned Jamison regarding text messages with a friend who was also allegedly working on such websites, and included the following exchange:

[Counsel]        You respond, 'If you are too nice, they try to get away with f'ing you without paying."  That's your text, correct?

[Jamison]      Yeah."

Counsel concluded as follows:

[Counsel]        Ms. Jamison, you view men – your motivation for meeting men or your viewpoint of men, at least back then, was that they are to be exploited, be taken advantage of, and they're a source of money to fund your lifestyle, correct? . . . Was that your attitude towards men back in 2013?

[Jamison]      No.

                . . .

[Counsel]        In fact, you saw Dr. Stanton as an opportunity to make money as an employee, but also to steal from him like your mom, correct?

[Jamison]      No, that's incorrect.  I never stole from him.

29

The trial court overruled defense counsel's objections on Evidence Code section 352 grounds, and admitted the text messages "over the defendant's objection." The trial court stated it was allowing this line of questioning because it was "relevant as to [her] qualifications or the motivations of being hired . . . by [MMM], and she's also a named defendant in this case."[8]

We conclude the trial court abused its discretion by permitting extended examination of Jamison on a highly prejudicial line of inquiry having no bearing on any material issue. Whether Jamison ever worked as an escort is a substantively immaterial consideration for the conversion cause of action against her, and there was no contention that her alleged escorting involved any illegal activity. Although Stanton argues (and the trial court ruled) such questioning was relevant to motive, motive is immaterial to civil conversion liability. (See *Voris v. Lampert* (2019) 7 Cal.5th 1141, 1150 ["[n]otably absent" from conversion analysis "is any element of wrongful intent or motive; in California, conversion is a 'strict liability tort'"]; accord, *Welco Electronics, Inc. v. Mora* (2014) 223 Cal.App.4th 202, 208 [""questions of the defendant's good faith, lack of

---

[8] During the defense case, Stanton's counsel also asked Jamison whether her mother was "an honest person." Jamison responded, "for the most part," and Stanton's counsel asked: "So she was correct when she accused you or said you were a prostitute in these messages; is that correct?" Defense counsel objected to the question as argumentative, which the trial court overruled. Stanton's counsel then left the "prostitution job" text message from Marques displayed on the courtroom screen during an extended pause before his next question, until the trial court directed him to take it down after Jamison asked twice that he do so.

30

knowledge, and motive are ordinarily immaterial"'"" to a conversion cause of action]; *Enterprise Leasing Corp. v. Shugart Corp.* (1991) 231 Cal.App.3d 737, 747-748 ["Because the tort of conversion is a species of strict liability, defendant's . . . motive is irrelevant."].)

More fundamentally, "'[p]ermitting the defense to elicit testimony from [a witness] that she engaged in acts of prostitution had an obvious potential for embarrassing or unfairly discrediting her. [Citation.] The degrading impact of such questions has long been recognized.'" (*People v. Phillips* (2000) 22 Cal.4th 226, 234 (*Phillips*); accord, *People v. Phillips* (1985) 41 Cal.3d 29, 49-50.) Indeed, the trial court has an obligation "to make interrogation as rapid, as distinct, and as effective for the ascertainment of the truth, as may be, and to protect the witness from undue harassment or embarrassment." (Evid. Code, § 765.) Here, questions regarding Jamison's "motivation for meeting men" to exploit them, and the time spent by Stanton's counsel on this line of questioning, consumed an undue amount of time on a collateral issue with "'obvious potential for embarrassing or unfairly discrediting [Jamison].'" (*Phillips, supra,* 22 Cal.4th at p. 234.)

Here, "[b]ecause this evidence has no tendency to prove or disprove any disputed fact . . . , its use is necessarily limited to impeachment." (*Winfred D. v. Michelin North America, Inc.* (2008) 165 Cal.App.4th 1011, 1034 (*Winfred D.*) Impeachment with such evidence is "highly prejudicial," and is properly excluded unless "'the patent prejudicial impact of permitting such questioning was substantially outweighed by its probative value.'" (*Phillips, supra,* 22 Cal.4th at p. 234.) In *Phillips*, for example, the high court affirmed exclusion of cross-examination

31

testimony from a witness regarding her past prostitution activities where it was "at most marginally relevant" to the issue of the defendant's alibi and "might have some slight relevance" to the witness's credibility. (*Ibid.*)

Additionally, "[a] party may not cross-examine a witness upon collateral matters for the purpose of eliciting something to be contradicted." (*People v. Lavergne* (1971) 4 Cal.3d 735, 744; accord, *Winfred D., supra,* 165 Cal.App.4th at p. 1036.) "These principles are of particular importance if the proffered evidence involves an issue of sexual conduct, and its admission is highly prejudicial and inflammatory." (*Winfred D.,* at p. 1034 [trial court abused its discretion in concluding evidence of extramarital affairs denied by plaintiff was more probative than prejudicial in personal injury case].) At most, Jamison's testimony and the text messages impeached her initial testimony denying that she ever engaged in transactional intimate relationships. However, "witnesses have a 'strong reason' to lie about an irrelevant or collateral matter, which suggests that the matter should not be used for impeachment. [Citation.] And where the irrelevant matter involves the witness's illicit, intimate conduct, there is a greater probability that the witness will lie." (*Winfred D.,* at pp. 1035-1036.) Accordingly, "the denial itself is irrelevant and prejudicial and thus inadmissible." (*Id.* at p. 1034.)

For the reasons explained below, we conclude it was reasonably probable this evidentiary error affected the outcome of the case, because no substantial evidence supported the liability finding against Jamison for conversion or the $50,000 damages award. (See *People v. Watson, supra,* 46 Cal.2d at p. 836.)

2. *Substantial Evidence Did Not Support Conversion Liability or the Damages Awarded Against Jamison*

The jury found Jamison liable for conversion although the evidence to support Jamison's liability was insufficient: acceptance of allegedly excess compensation authorized by Marques, including health insurance benefits, cell phone, and car payments, and her access to MMM's financial records from 2011 to 2014. Further, the $50,000 conversion damages award against Jamison is so disproportionate to Stanton's evidence at trial of actual monies wrongfully acquired by Jamison that it compels the conclusion it was the result of passion or prejudice by the jury. (See *LA Investments, LLC v. Spix* (2022) 75 Cal.App.5th 1044, 1063 ["The appellate court will interfere with the jury's determination only when the award is so disproportionate to the injuries suffered that it shocks the conscience and virtually compels the conclusion the award is attributable to passion or prejudice."].) Indeed, no substantial evidence supports the $50,000 compensatory damages award against Jamison.

The jury was instructed that any conversion damages were to be awarded for "[t]he specific amount of monies that were wrongfully taken" and any emotional distress. The jury awarded Stanton $0 emotional distress damages. To justify the award, Stanton argues "the jury heard substantial testimony from multiple witnesses and were presented with thousands of pages of exhibits including voluminous bank records, detailed accounting records and forensic analysis by Mr. Lyons based on the accounting data/records created by Defendants Frances and Pablynie. The jury used this substantial evidence to support its finding of fact that Pablynie converted $50,000 of Plaintiff's monies."

33

But the $50,000 damages award against Jamison is not supported by this evidence. As to Jamison, Lyons presented a single spreadsheet reflecting payments made to her for "professional services" (i.e., her monthly salary) and payments to an insurance company for Jamison's health benefits. Stanton makes no argument the salary amounts were wrongfully paid to Jamison or should be the basis for conversion damages. The other damages listed on the spreadsheet reflect that MMM paid a total of $3,443.55 in health care insurance payments for Jamison. Stanton presented no other evidence regarding money Jamison received from MMM for car or cell phone payments. The evidence that was presented to the jury was insufficient to support an award of $50,000. (See *Lueter v. State of California* (2002) 94 Cal.App.4th 1285, 1302 ["'[D]amages which are speculative, remote, imaginary, contingent, or merely possible cannot serve as a legal basis for recovery.'"]; see also *People ex rel. Department of Public Works v. McCullough* (1950) 100 Cal.App.2d 101, 105 [affirming grant of new trial where damages "appeared to be without sufficient evidentiary support"; "a jury cannot disregard the evidence as to value and render a verdict in excess of that shown by the testimony of the witnesses"].)

Under the circumstances, it is reasonably probable the evidentiary error discussed above affected the jury's liability and damages findings as to Jamison, mandating a new trial.[9]

---

[9] During the punitive damages phase, Stanton's counsel also asked Marques if she ever received payment "for any kind of service" from a friend. The trial court then asked Marques to clarify whether she was "in the same type of business that your daughter allegedly was . . . [a]n escort or companion service," and whether she ever received any "money or gifts" for her companionship, which Marques denied. Such questioning is

34

3. *Inconsistent Findings in the Jury's Special Verdict as to Marques and Lack of Substantial Evidence Supporting the Compensatory Damages Award Against Jamison Require a New Trial*

Marques contends the jury's $1,652,128 compensatory damages award is excessive and inconsistent with the jury's special verdict findings because it fails to reflect her 50 percent right to MMM's profits under the operating agreement. Marques argues the jury's special verdict finding that she breached the contract includes an implicit finding the contract was valid and an express finding that Stanton and Marques had co-equal entitlement to share in MMM's proceeds. Yet the jury awarded Stanton damages using his expert's calculations which assumed Marques was not entitled to any of MMM's proceeds. We conclude the jury made contradictory findings in its special verdict, rendering the verdict irreconcilably inconsistent. As outlined above, we have already concluded that no substantial evidence supports the $50,000 compensatory damages award against Jamison. Accordingly, we reverse and remand for a new trial on both liability and damages as to both Marques and Jamison.

a. *Governing law and standard of review*

"The amount of damages is a fact question, committed first to the discretion of the jury and next to the discretion of the trial

_____

improper for the reasons outlined above, and it was error for the trial court to permit such questions and to affirmatively question Marques about whether she had worked as an escort. Because we reverse and remand the judgment against Marques for a new trial on other grounds, we need not decide whether this error was prejudicial.

35

judge on a motion for new trial." (*Westphal v. Wal-Mart Stores, Inc.* (1998) 68 Cal.App.4th 1071, 1078; see § 662.5, subd. (a).)

We ordinarily review a jury's award of damages based on the verdict for substantial evidence, viewing the evidence in the light most favorable to the verdict. (*Fassberg, supra,* 152 Cal.App.4th at p. 746.) But where a party argues the jury's special verdict is inconsistent or irreconcilable, "we review a special verdict de novo to determine whether its findings are inconsistent." (*Singh v. Southland Stone, U.S.A., Inc.* (2010) 186 Cal.App.4th 338, 358 (*Singh*); accord, *Zagami, Inc. v. James A. Crone, Inc.* (2008) 160 Cal.App.4th 1083, 1092 (*Zagami*); *City of San Diego v. D.R. Horton San Diego Holding Co., Inc.* (2005) 126 Cal.App.4th 668, 678 (*Horton*).) "With a special verdict, unlike a general verdict or a general verdict with special findings, a reviewing court will not infer findings to support the verdict." (*Singh,* at p. 358; accord, *Horton,* at p. 679 [""there is no such presumption in favor of upholding a special verdict""].) "Where there is an inconsistency between or among answers within a special verdict, both or all the questions are equally against the law" and "[t]he appellate court is not permitted to choose between inconsistent answers." (*Horton,* at p. 682)

In the case of inconsistent damages findings in a special verdict, "'[w]here the trial judge does not interpret the verdict or interprets it erroneously, an appellate court will interpret the verdict if it is possible to give a correct interpretation. [Citations.] If the verdict is hopelessly ambiguous, a reversal is required, although retrial may be limited to the issue of damages.'" (*Zagami, supra,* 160 Cal.App.4th at p. 1091 [new trial on damages required where breach of contract damages figure

36

conflicted with valuation finding on separate cause of action, in light of uncontroverted expert testimony regarding value of missing equipment], quoting *Woodcock v. Fontana Scaffolding & Equipment Co.* (1968) 69 Cal.2d 452, 456-457; see *Horton, supra,* 126 Cal.App.4th at p. 683 [new trial appropriate where inconsistent special verdict findings were "implicitly based on different fair market values for the same parcel of property at the same point in time"].) "'The inconsistent verdict rule is based upon the fundamental proposition that a factfinder may not make inconsistent determinations of fact based on the same evidence.'" (*Horton,* at p. 682.) "An inconsistent verdict may arise from an inconsistency between or among answers within a special verdict [citation] or irreconcilable findings." (*Ibid.*)

b. *Relevant jury instructions*

The jury was instructed that to recover for breach of contract, here the MMM operating agreement, Stanton had to prove (1) he and Marques entered into a contract, (2) Stanton performed his requirements under the contract, and (3) that under the terms of the operating agreement Stanton and Marques were "co-equal Members with equal economic interests in MMM." (See CACI No. 303.) As to contract damages, the court instructed the jury that Stanton claimed "damages for monies improperly obtained" by Marques and that the purpose of contract damages was to put Stanton "in as good a position as he would have been if . . . Marques had performed as promised." (CACI No. 350.)

On conversion, the jury was instructed that Stanton needed to prove, among other elements, Marques's substantial interference with his property by "knowingly or intentionally

37

taking possession of his monies." (CACI No. 2100.) On breach of fiduciary duty, the jury was instructed on the duty of good faith and fair dealing, the duty of undivided loyalty, and failure to use reasonable care. On damages for these two causes of action, the jury was instructed that Stanton claimed (1) economic damages solely in the form of "monetary damages" (further defined for conversion as "[t]he specific amount of monies that were wrongfully taken"), and (2) noneconomic damages for emotional distress. (CACI No. 2102.) The court further instructed that compensatory damages were recoverable only once under all of the causes of action, and that the damages award "must be based on your reasoned judgment applied to the testimony of the witnesses and the other evidence that has been admitted during trial."

> c. *Marques is entitled to a new trial because the jury's finding the operating agreement was valid is irreconcilable with its award of compensatory damages premised on no valid contract existing*

The parties agree the jury reached the $1,652,128 damages award by taking Lyons's second alternate damages calculation ($1,952,128) and subtracting $300,000 (Marques's capital contribution).[10] Indeed, during its deliberations, the jury asked for and received Lyons's damages exhibit. The parties further agree the damages calculation used by the jury was based on Lyons's assumption there was no valid contract and that

---

[10] Marques and Jamison's opening brief posits the jury may have taken a "weighted average" of Lyon's different damages analyses but their reply agrees with Stanton the jury credited Marques's testimony in applying a $300,000 reduction to the damages figure.

38

Marques had no right to any of MMM's profits (but included an amount for a salary). As noted above, Marques and Jamison presented no expert testimony on damages.

We agree the jury's special verdict is inconsistent. As relevant here, the jury was instructed that to rule for Stanton on the contract cause of action it needed to find that (a) "he and Marques entered into a contract" (which contains an implicit finding the contract was valid) and (b) Stanton and Marques had "equal economic interests in MMM." The jury was further instructed that Stanton claimed contract "damages for monies improperly obtained" by Marques, and that the purpose of such damages was to put Stanton "in as good a position as he would have been if . . . Marques had performed as promised." Yet, in deciding how much to award Stanton in damages, the jury used Lyons's damages calculation premised on no valid contract existing and that Marques was not entitled to any of MMM's proceeds. "'[A] factfinder may not make inconsistent determinations of fact based on the same evidence.'" (*Horton, supra,* 126 Cal.App.4th at p. 682.) Further, Stanton was only entitled to recover for any "monies improperly obtained" by Marques, and if a valid contract existed the damages awarded could not include amounts to which she was legally entitled given her equal economic interest in MMM.

In short, the jury's finding of a valid contract with equal economic interests is inconsistent with its finding that Stanton suffered $1,652,128 in compensatory damages. (See *Singh, supra,* 186 Cal.App.4th at p. 357 ["A special verdict is inconsistent if there is no possibility of reconciling its findings with each other."].) If allowed to stand, the jury's special verdict would award Stanton greater compensatory damages than he

39

was entitled to under the MMM operating agreement (over $600,000 more than Lyons's first alternate damages calculation of $1,034,965, which assumed a valid contract and 50/50 rights to MMM's profits under the operating agreement).

That the jury awarded the same compensatory damages amount on Stanton's tort causes of action does not resolve the inconsistency in the verdict. The jury was instructed that, for the conversion and breach of fiduciary duty causes of action, the damages Stanton claimed were limited to "[t]he specific amount of monies that were wrongfully taken" (for conversion), "monetary damages," and emotional distress. As noted above, the jury expressly awarded "$0" emotional distress damages, making monetary damages the only basis for the compensatory award.

As to conversion, since the jury was instructed Stanton was only entitled to receive damages for amounts that were "his monies" or "wrongfully taken," he was not entitled to recover from Marques any monies that she was legally entitled to under the operating agreement given their equal economic interests.

The breach of fiduciary duty cause of action does not provide a basis for a more expansive award of monetary damages. The damages Stanton claimed at trial were limited to his economic losses, and the only evidence he presented on that front was Lyons's testimony. Stanton did not present any evidence that he incurred, for example, any out-of-pocket economic losses due to Marques's malfeasance or any other form of economic damages (e.g., lost income, extra tax or accounting expenses, etc.). As such, the jury's only basis to award damages was Lyons's testimony and its damages award was based on the irreconcilable findings that the contract was valid and Marques had an equal economic interest in MMM, on the one hand, and a

40

damages amount premised on the theory the contract was invalid and Marques had no such interest, on the other hand.  In other words, given the evidence at trial and the jury's finding the operating agreement was valid, Stanton's economic loss under any theory presented to the jury would be the amount due to Stanton under the terms of the operating agreement.

Stanton argues the jury was "free to disregard MMM's Operating Agreement" if it believed Marques used MMM to steal Stanton's monies.  Stanton also suggests the "multiple scenarios" to which Lyons testified were substantial evidence supporting the jury's damages award.  But the jury's special verdict demonstrates it did not "disregard" the agreement, and it instead found the operating agreement was a valid contract.  And although it is plausible Lyons's damages calculations might have constituted substantial evidence for the damages award (in the absence of a finding the contract was valid and if Stanton had only prevailed on the tort theories of liability), that is not what the jury did here.  More fundamentally, we are prohibited from choosing between inconsistent answers in a special verdict. (*Zagami, supra,* 160 Cal.App.4th at p. 1091; cf. *Shaw v. Hughes Aircraft Co.* (2000) 83 Cal.App.4th 1336, 1344-1346 [new trial required on finding of inconsistent general verdicts as to breach of contract and breach of implied covenant of good faith and fair dealing].)  The general rule that a jury may ""'accept the evidence of any one expert or choose a figure between them based on all of the evidence'"" does "not override the independent rule that a jury's special verdict findings must be internally consistent and logical." (*Horton, supra,* 126 Cal.App.4th at pp. 681, 683.)

41

We are unable to find a rational explanation for the damages award.  The record supports no alternate basis for the compensatory damages figure under any cause of action, and a new trial is required.  "If the record contained such evidence, the door might be open to a conclusion that the trial court's error [in denying a motion for new trial based on inconsistent special verdict] was harmless because it probably would have reached the same result under proper legal principles." (*Ryan v. Crown Castle NG Networks, Inc.* (2016) 6 Cal.App.5th 775, 787.)  But the record before us provides no factual basis to conclude the damages could be calculated in the amount the jury awarded.

Marques and Jamison assert the judgment should simply be reduced to reflect Lyons's first alternate damages calculation of $1,034,965 (which assumes 50/50 rights to MMM's profits under the operating agreement), less Marques's capital contribution.[11]  Again an "appellate court is not permitted to choose between inconsistent answers" in an inconsistent special verdict; rather, the appropriate course is to reverse and remand for a retrial.  (*Horton, supra,* 126 Cal.App.4th at p. 682; accord, *Zagami, supra,* 160 Cal.App.4th at p. 1092.)  Although in some

_____

[11] Marques and Jamison's opening brief and reply brief present alternate proposals for how to calculate Marques's capital contribution, resulting in either a $150,000 or $300,000 reduction to the damages award.  Because we reverse and remand with directions to conduct a new trial, we need not address the appropriate method of calculation of Marques's capital contribution.  For the same reason, we need not address Marques and Jamison's related argument the trial court erroneously failed to reduce Stanton's damages to account for the purchase with MMM funds of a $60,000 watch intended as a gift from Stanton to Marques.

cases retrial may be appropriate on damages only, we conclude retrial on both liability and damages is required here because the inconsistency arises from a contradiction between a liability finding (of breach of a valid contract with equal economic interests) and damages finding (that Stanton suffered $1,652,128 in compensatory damages).

## DISPOSITION

The judgment is reversed, and the matter is remanded with directions to the trial court to:  (1) enter a new order denying nonsuit on Stanton's Penal Code section 496 cause of action and conduct a new trial on this cause of action; Stanton shall be required to elect his remedies as between treble damages, on the one hand, and punitive damages, on the other hand, should he prevail; (2) conduct a new trial on liability and damages as to the causes of action for conversion, breach of contract, breach of fiduciary duty, and fraudulent transfer as to Marques; and (3) conduct a new trial on liability and damages as to the cause of action for conversion as to Jamison.  The parties are to bear their own costs on appeal.


                              MARTINEZ, J.

We concur:


    SEGAL, Acting P. J.                    FEUER, J.


43